UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA D. COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CV 1458 RWS |
| | ) | |
| KILOLO KIJAKAZI[1], | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Linda D. Cooper brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's decision denying her application for disability benefits under the Social Security Disability Insurance Program (SSDI), Title II of the Social Security Act, 42 U.S.C. §§ 401-434 and for benefits under the Supplemental Security Income Program (SSI), Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385.  For the reasons set forth below, I will affirm the decision of the Commissioner.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## Procedural History

Plaintiff Linda Cooper was born on October 1, 1972.  She is currently 49 years old.  She dropped out of high school in the 12th grade and has not earned a General Education Diploma (GED).[2]  In the past several years before she applied for disability benefits Cooper worked as a temporary office worker, in fast-food restaurants, and as a store clerk.  In the three years before she applied for benefits Cooper earned less than $10,000 per year at these jobs.  (Tr. 148-152.)  The last job Cooper held was as a stocker and cashier at a Dollar General store.  (Tr. 30.)  Her employment was terminated in August 2018, because her right hip hurt so badly that she was unable to perform her job duties.  (Tr. 30-31.)

Cooper protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on September 5, 2018.  (Tr. 10, 135.)  She alleges that she became disabled beginning August 26, 2018, because of severe osteoarthritis in her right hip, walking with a limp, and the need for a possible hip replacement.  (Tr. 44, 55.)

Plaintiff's applications were initially denied on December 6, 2018.  (Tr. 53, 64.)  After a hearing before an Administrative Law Judge (ALJ) on October 17, 2019, the ALJ issued a decision denying benefits on January 21, 2019.  (Tr. 7-18.)

---

[2] GED actually stands for General Education Development Test, however the initials have been used in the vernacular to mean a Graduate Equivalency Degree or a General Educational Diploma. https://ged.com/blog/what-is-a-ged/

On September 10, 2020, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.)  The ALJ's decision is now the final decision of the Commissioner.  42 U.S.C. §§ 405(g) and 1383(c)(3).

In this action for judicial review, Cooper contends that the ALJ failed to properly evaluate Cooper's subjective complaints regarding her physical and daily activities limitations in determining her residual functional capacity (RFC). Cooper requests that I reverse the Commissioner's final decision and remand the matter for the ALJ to conduct a "proper evaluation" of Cooper's activities of daily living.  For the reasons that follow, I will deny Cooper's request to remand this matter for further proceedings.

## Medical Records and Other Evidence Before the ALJ

With respect to the medical records and other evidence of record, I adopt Cooper's recitation of facts (ECF # 26).  Additional specific facts will be discussed as needed to address the parties' arguments.

## Discussion

A.   <u>Legal Standard</u>

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that he is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity (SGA).[3]  If not, the disability analysis proceeds to the second step.  In this step the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled and the analysis

---

[3] "Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. 'Substantial work activity' is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  'Gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience." (Tr. 11.)

4

ends.  If the claimant has a severe impairment the Commissioner then proceeds to

the third step and determines whether claimant's impairment(s) meets or equals

one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If

claimant's impairment(s) is equivalent to one of the listed impairments, he is

conclusively disabled.  If the impairment is not equivalent to a listed impairment,

then the Commissioner proceeds to the fourth step to determine whether the

claimant can perform his past relevant work.[4]  If so, the claimant is not disabled.  If

not, at the last step the Commissioner evaluates various factors to determine

whether the claimant is capable of performing any other work in the economy.  If

not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402

U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion.  Johnson v. Apfel, 240

F.3d 1145, 1147 (8th Cir. 2001).  "[Substantial evidence] means – and means only

– such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

---

[4] "The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965)."  (Tr. 12.)

Determining whether there is substantial evidence requires scrutinizing analysis. Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. McNamara, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> [The] claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and

6

aggravating factors; (4) dosage, effectiveness and side effects of
medication; and (5) functional restrictions.

Id. at 1322.[5]  When an ALJ explicitly finds that the claimant's testimony is

not credible and gives good reasons for the findings, the court will usually defer to

the ALJ's finding.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  However,

the ALJ retains the responsibility of developing a full and fair record in the non-

adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838

(8th Cir. 2002).

B.    ALJ's Decision

In her written decision, the ALJ found that Cooper had not engaged in

substantial gainful activity since August 26, 2018, the alleged onset of her

disability.  (Tr. 12.)  The ALJ found that Cooper had the following severe

impairments: degenerative joint disease of the bilateral hips; degenerative disc

disease; and obesity.  The ALJ found plaintiff had the non-severe impairment of

hypertension because it's controlled by medication and does not cause more than

minimal limitations in Cooper's ability to work.  (Tr. 12-13.)  The ALJ determined

that Cooper's impairments or combination of impairments did not meet or

---

[5] This was once referred to as a credibility determination, but the agency has now eliminated use of the term
"credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.
However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's
evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are
consistent with the objective medical evidence and other evidence of record."  See SSR 16-3p, 2017 WL 5180304,
at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th
Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied"
when evaluating a claimant's subjective complaints).

medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.
(Tr. 13.)  The ALJ found Cooper to have the residual functional capacity (RFC) to
perform sedentary work with the following limitations:

> [Cooper] must use a cane to ambulate and can never climb ropes,
> ladders, or scaffolds; can only occasionally climb ramps and stairs;
> never balance (as defined in DOT and SCO as walking, crouching or
> running on narrow, slippery, or erratically moving surfaces); only
> occasionally stoop; never kneel, crouch or crawl; and should have no
> concentrated exposure to extreme heat, extreme cold, vibration,
> unprotected heights, and hazardous machinery.

(Tr. 13.)  The ALJ made no finding as to whether Cooper could perform her
past relevant work based on her RFC because the evidence in the record did not
clearly show whether Cooper had past relevant work.  (Tr. 16.)  The ALJ consulted
a vocational expert (VE) to assess whether jobs within Cooper's RFC existed in
significant numbers in the national economy.  (Tr. 39-41.)  The VE identified the
jobs of an addresser (3,002 positions); a document preparer (19,044 positions)[6];
and an information clerk (3,560 positions).  (Tr. 40.)  The ALJ therefore
determined that plaintiff was not disabled within the meaning of the Social
Security Act.  (Tr. 18)

---

[6] The ALJ's decision lists the job of auto body detailer identified by a DOT number.  But according to the hearing transcript the VE identified the job with the same DOT number as a document preparer.

Cooper claims that this decision is not supported by substantial evidence because the ALJ should have expressly evaluated Cooper's testimony at the hearing regarding her physical limitations and her daily living needs.

C.    RFC

Cooper's most severe health issue contributing to her alleged disability is the deterioration of her right hip. (Tr. 31.)  The medical records undisputedly establish that Cooper has had significant issues in her right hip.  On January 8, 2018, Cooper was seen by orthopedic surgeon John Weltmer, Jr. MD at BJC Medical Group in St. Louis, Missouri.  (Tr. 307-310.)  In the medical report Dr. Weltmer noted that Cooper was seeking treatment for a painful right hip that she says has been bothering her since 2008.  Cooper reported that her hip pain is made worse with activity.  Cooper also reported a history of hypertension.  She was taking amlodipline[7] for her hypertension and naproxen[8] to treat the hip pain.  X-ray scans of Cooper's hip revealed significant osteoarthritis in her right hip with joint space narrowing, spurring and cystic changes of both the femoral head and acetabulum. Dr. Weltmer noted that Cooper had a reduced range of motion in her right hip but that she had normal stability and full strength in that hip.  (Tr. 309)  Dr. Weltmer prescribed naproxen for Cooper's pain.  Dr. Weltmer noted that Cooper's weight

---

[7] Amlodipine is a medication used to treat high blood pressure.
[8] Naproxen is a nonsteroidal anti-inflammatory medication used to relieve the symptoms of arthritis and other conditions by reducing inflammation and pain.

classified her as obese and he recommended a weight loss program to Cooper that would help relieve her hip pain.  (Tr. 310.)

In a follow-up visit with Dr. Weltmer on May 23, 2018, Cooper reported that she did not find that the naproxen helpful to relieve her pain.  (Tr. 311-313.) Dr. Weltmer prescribed diclofenac[9] as a substitute for naproxen.  He also scheduled Cooper for a cortisone injection for the right hip.  He noted that Cooper's right hip flexion was painful and had a reduced range of motion.  He also noted that she walks with an antalgic gait.[10]  Dr. Weltmer told Cooper that she needed to lose weight to help relieve her hip pain and that weight loss would be essential so that she could potentially have a total hip replacement in the future.

On September 12, 2018, Cooper was seen again by Dr. Weltmer.  (Tr. 310, 313-316.)  Cooper reported that she had received a cortisone injection on May 29, 2018, but that she did not get any significant relief.  Dr. Weltmer noted that Cooper had a reduced range of motion in her right hip but that she had normal stability and full strength in that hip.  (Tr. 314.)  He noted that some of her hip motion was limited because of her size (her obese condition).  Dr. Weltmer prescribed meloxicam as a substitute for diclofenac.  He noted that Cooper would probably need a hip replacement but that he would like her Body Mass Index down to 40

---

[9] Diclofenac is an alternative nonsteroidal anti-inflammatory medication used to relieve the symptoms of arthritis.
[10] An antalgic gait occurs when you walk with a limp because of pain. https://www.webmd.com/pain-management/what-is-antalgic-gait

which meant her weight needed to be down to 247 pounds.  (Tr. 315.)  On

December 12, 2018, Cooper had a follow-up visit for her right hip pain at BJC

Medical Group with Sherri Ann Shoe, PA.  (Tr. 360-361.)  PA Shoe noted that

Cooper did not fill her meloxicam prescription because Cooper thought it was sent

to the wrong pharmacy.  Copper's range of hip motion was greater than in

September but was done accompanied by pain.  Meloxicam was prescribed.  PA

Shoe noted that Cooper had gained weight and she counseled Cooper on the need

to reduce her weight to allow her to qualify for hip replacement surgery.  (Tr. 361.)

On February 21, 2019, Cooper had an annual exam at People's Health

Centers.  (Tr. 348-352.)  The medical report from that visit noted that Cooper

reported that she never exercised and that her pain score, measured on the Numeric

Pain Intensity Scale, was a 0/10.  On February 25, 2019, Cooper attended an

appointment at People's Health Centers for a physical exam and for hypertension.

(Tr. 342-347.)  The medical report from that visit noted that Cooper reported that

she had not taken her blood pressure medication for over a year and that she had

arthritis of the right hip.

On March 13, 2019, Cooper had another follow-up visit with PA Shoe at

BJC Medical Group.  Shoe noted that Copper's hip had been treated conservatively

for the past year.  She also noted that Cooper had not lost weight and that she

reported she had difficulty getting her socks and shoes on.  (Tr. 358-359.)  PA

Shoe renewed Copper's meloxicam prescription, reviewed the importance of losing weight, and gave her home stretches to for her hip.  Cooper also received a 3-month handicap parking placard.

On May 17, 2019, Cooper went to People's Health Centers for an itching issue.  (Tr. 337-341.)  The medical report from that visit noted that Cooper's pain score measured on the Numeric Pain Intensity Scale was a 0/10.

On July 17, 2019, Cooper went to People's Health Centers for a routine check-up.  (Tr. 331-336.)  The medical report from that visit noted that Cooper never exercised and that her pain score measured on the Numeric Pain Intensity Scale was a 0/10.

On July 17, 2019, Cooper also went to medical appointment with Kathy Jo Swindle, PA at BJC Medical Group.  (Tr. 354-357.)  This appointment was three months before Cooper's hearing with the ALJ.  PA Swindle's report notes that in addition to the problems with her right hip, Cooper was beginning to have left hip pain.  Cooper reported that her right hip was getting worse and that she had difficulty with her range of motion as well as being able to put a shoe on.  Cooper reported needing assistance most of the time to get her shoe on.  Cooper was walking with a cane and had trouble ambulating.  She inquired about surgery. Cooper also wanted a refill of her meloxicam prescription because it was "the only thing that can keep her comfortable."  (Tr. 354.)  PA Swindle's reported noted that

12

Cooper was alert and oriented and that she was not in acute distress.  Cooper had lost a little weight and her hip mobility was slightly better since her last visit. An x-ray of Cooper's hip that day revealed that the narrowing had progressed and that the hip was bone-on-bone with some flattening of the femoral head as well.  No acute bony abnormality was detected.  (Tr. 353).  PA Swindle opined that Cooper's osteoarthritis was "significant and end stage."  PA Swindle gave Cooper a referral to physical therapy (aqua therapy) to help with weight loss and refilled her meloxicam prescription.

On October 2, 2019, two weeks before her hearing before the ALJ, Cooper had visit with PA Shoe at BJC Medical Group regarding left hip pain.  (Tr. 395-398.)  PA Shoe reported that Cooper had lost weight and "could anticipate having [right] hip replacement surgery at some point in the near future if she continues on this path."  (Tr. 396.)  Cooper reported that a month earlier she had been moving into a new apartment and "had been lifting furniture etc." and when she woke up the next day she had shooting pain in her left hip and thigh.  (Tr. 395.)  She went to an emergency room where x-rays were taken and interpreted as unremarkable. Cooper was given an anti-inflammatory and a muscle relaxer.  Aside from moving and lifting furniture, Cooper did not recall any injury that may have caused her left hip pain.  Cooper was given a prescription for prednisone and a referral to outpatient physical therapy.

On December 12, 2018, Garland Tschudin, M.D., a medical consultant employed by the Commissioner reviewed all the medical records submitted by Cooper through that date.  (Tr. 47-53.)  Dr. Tschudin opined that Cooper could sit about 6 hours in an 8-hour work day with normal breaks; frequently lift or carry 10 pounds in an 8-hour work day; could climb stairs occasionally; could balance, stoop, kneel, crouch, or crawl occasionally; and should avoid external hazards like extreme heat and cold.  (Tr. 48-49.)  Dr. Tschudin noted Cooper has a severe impairment based on the osteoarthritis in her right hip and obesity; experienced pain because of her condition; has an antalgic gait but did not use an assistive device; has a reduced range of motion in her right hip; shops every week for two hours; drives a car; and can go out alone.  Based on his review of Cooper's records, Dr. Tschudin opined that Cooper retained the ability to do sedentary work. (Tr. 52.)

Based on all the evidence, the ALJ concluded that, although Cooper did have the severe impairments of degenerative joint disease of the bilateral hips, degenerative disc disease, and obesity, she had a residual functional capacity to perform sedentary work.  The ALJ found Dr. Tschudin's opinion "mostly persuasive" as it was fairly supported and consistent with the record.  However, the ALJ found that subsequent medical records submitted after Dr. Tschudin's review called for greater postural limitations.  In her RFC determination the ALJ differed

14

from Dr. Tschudin's opinion concluding that Cooper could never balance, kneel, crouch or crawl, and she must use a cane to ambulate.

In her decision the ALJ found that Cooper could "care for her children [two boys 9 and 17 years old], prepare meals, clean house, do laundry, drive, shop in stores, manage funds, read, complete puzzles, watch television, socialize with friends and family, get along with others, pay attention, follow instructions, and handle stress and changes in routine." The ALJ also found that meloxicam helped alleviate Cooper's pain.  (Tr. 14.)

Cooper argues that the ALJ did not expressly evaluate the credibility of the limitations Cooper raised at the hearing.  Cooper asserts that her testimony revealed that she could not sit more than 30 to 40 minutes at a time secondary to pain. (Tr. 32.)  She testified she is only able to stand for about five to ten minutes until she has to sit down.  (Tr. 31.)   She testified that she has difficulty getting out of a chair and can only walk five or ten minutes before she has to stop.  (Tr. 32-33.)  Cooper testified that she takes meloxicam and it helps "a little bit" with the pain.  (Tr. 33.)  She testified that she lays down "basically all day" to relieve her hip pain.  (Tr. 34.)  Cooper testified she sometimes cooks for the kids but has to take breaks or her cousin helps her.  (Tr. 34.)  She has pain when bending over to put pants on and testified that her son has to put her shoes and socks on.  (Tr. 33.)  Cooper testified that she does not vacuum or sweep and that her oldest son does the

laundry and she helps fold while sitting.  Cooper testified that she does dishes while sitting at the sink.  (Tr. 36.)  She testified that she goes to the grocery store once a week for about 30-40 minutes but that she needs to lean on the shopping cart as she walks around.  (Tr. 38.)

Cooper claims that the ALJ has not expressly provided information from the record to undermine Cooper's hearing testimony about her limitations.  But the record does contain such information.  In her decision, the ALJ found that Cooper's hearing testimony regarding the intensity, persistence and limiting effects of her impairments were not entirely consistent with the medical record.  (Tr. 14.) The record indicates that Cooper's pain improved when she took meloxicam.  (See Copper's testimony (Tr. 33.); Cooper's medical records from three visits to People's Health Centers that listed Cooper's pain score a 0/10 as measured on the Numeric Pain Intensity Scale (Tr. 333, 339, 350.); and Cooper's statement on her July 17, 2019 visit to BJC Medical Group, three months before her hearing with the ALJ, that meloxicam "was the only thing that can keep her comfortable." (Tr. 354.))  In addition, Cooper was able to lose weight and was nearing the point she could undergo hip surgery.  The ALJ noted this weight loss in her decision.  (Tr. 15.)  The ALJ acknowledged that Cooper had mobility difficulties due to pain but concluded that it did not amount to disabling pain.  In her decision, the ALJ notes that although Cooper's right hip may have a reduced range of motion, several

16

medical examinations at BJC Medical Group revealed that Cooper displayed a normal motor strength of 5/5 and normal stability.  (Tr. 15, 309, and 314.)

The record contains evidence that is inconsistent with Cooper's claims about her condition's limitations on her daily activities.  In her Function Report (Tr. 209-216.), signed on November 19, 2018, Cooper stated that she gets her son ready for school and picks him up from school.  She daily prepares sandwiches and frozen dinner for meals.  She performs the household chores of doing the laundry and cleaning.  (Tr. 211.)  She goes outside every day.  She drives a car.  She shops in stores every two weeks for two hours to purchase groceries and household items.  She goes to family and friends' houses weekly or every other week.  Notably, on October 2, 2019, two weeks before her hearing with the ALJ, Cooper injured her left hip while moving and lifting furniture.  (Tr. 395.)  All of this information that Cooper provided in the record provides substantial evidence for the ALJ to discount Cooper's hearing testimony regarding her limitations on sitting, standing, and walking, and her assertion that she lays down "basically all day."

## Conclusion

Based on the complete record in this case, I find that the ALJ's conclusions regarding Cooper's daily living activity limitations and her determination of Cooper's RFC is supported by substantial evidence in the record.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security is affirmed.

A separate Judgment is entered herewith.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2022.

18